## Case No. 8,646.
### LYON'S CASE.
[Whart. St. Tr. 333.] [1]

Circuit Court, D. Vermont.  Oct. 9, 1798.

SEDITIOUS LIBEL—PROVINCE OF JURY—INTENT OF PUBLICATION.

[On the trial of an indictment for seditious libel, the jury have no concern with the question of the constitutionality of the law. Act July 14, 1798 (1 Stat. 596). The only questions for them to determine are whether defendant published the writing, and, if so, whether he did it seditiously; that is, with intent to make the government and president odious and contemptible, and bring them into disrepute.]

[This was an indictment, under the act of July 14, 1798, against Matthew Lyon, for the publication of a seditious libel.]

The indictment which was found on October 5, 1798, contained three counts, the first of which, after averring the intent to be "to stir up sedition, and to bring the president and government of the United States into contempt," laid the following libellous matter: [2] "As to the executive, when I shall see the efforts of that power bent on the promotion of the comfort, the happiness, and accommodation of the people, that executive shall have my zealous and uniform support: but whenever I shall, on the part of the executive, see every consideration of the public welfare swallowed up in a continual grasp for power, in an unbounded thirst for ridiculous pomp, foolish adulation, and selfish avarice; when I shall behold men of real merit daily turned out of office, for no other cause but independency of sentiment; when I shall see men of firmness, merit, years, abilities, and experience, discarded in their applications for office, for fear they possess that independence, and men of meanness preferred for the ease with which they take up and advocate opinions, the consequence of which they know but little of—when I shall see the sacred name of religion employed as a state engine to make mankind hate and persecute one another, I shall not be their humble advocate."

The second count consisted of having ma-

---

[1] [The report of this case. with the exception of the syllabus, was prepared by Francis Wharton, Esq.]

[2] The materials of this case. which, with the greatest difficulty. I have collected. are drawn chiefly from the New York Spectator of Oct. 24, 1798, a paper then said to be under Mr. Hamilton's control, and of course decidedly Federal. and from the Aurora of Nov. 15, 1798, whose politics were equally decided the other way. I have made very general inquiries for fuller details, but the Vergennes paper of that day goes no further than those just cited, and I understand that a fuller report is not now to be obtained.

liciously, &c., and with intent, &c., published a letter, said to be a letter from a diplomatic character in France, containing two paragraphs in the words following: "The misunderstanding between the two governments (France and the United States), has become extremely alarming; confidence is completely destroyed, mistrusts, jealousy, and a disposition to a wrong attribution of motives, are so apparent, as to require the utmost caution in every word and action that are to come from your executive. I mean, if your object is to avoid hostilities. Had this truth been understood with you before the recall of Monroe, before the coming and second coming of Pinckney; had it guided the pens that wrote the bullying speech of your president, and stupid answer of your senate, at the opening of congress in November last, I should probably had no occasion to address you this letter. —— But when we found him borrowing the language of Edmund Burke, and telling the world that although he should succeed in treating with the French, there was no dependence to be placed on any of their engagements, that their religion and morality were at an end, that they would turn pirates and plunderers, and it would be necessary to be perpetually armed against them, though you were at peace: we wondered that the answer of both houses had not been an order to send him to a mad house. Instead of this the senate have echoed the speech with more servility than ever George III. experienced from either house of parliament."

The third count was for assisting, counselling, aiding, and abetting the publication of the same.

Saturday, Oct. 7. The defendant, being still in custody, (having been arrested on a bench warrant immediately after the finding of the bill,) pleaded not guilty, and put in bail for his appearance on Monday, October 9.

Monday, Oct. 9. The panel being called, a juror named Board, was challenged for cause by the district attorney, (Mr. Charles Marsh.) Question. Have you formed or expressed an opinion as to the guilt or innocence of the accused? Answer. No.

The district attorney then produced one of the deputy sheriffs who had summoned the jury, who testified that he heard the juror say he thought Mr. Lyon would not, or should not, be condemned.

PATERSON, Circuit Justice. Let the juror stand aside, and unless there is not enough to form a jury without him, you need inquire no further.

Two jurors were challenged by the defendant for cause. Against one no evidence was produced, and there appears to have been no examination of him on his venire dire. The other was shown to have been the author of an article in a newspaper, inveighing politically and personally against the defendant.

PATERSON, Circuit Justice. The cause

shown is sufficient, as a difference of this nature is a disqualification.

The box having been filled, and the jury sworn, the defendant interposed an additional plea, to the effect that the sedition law was unconstitutional, which plea was stricken off by the court.

The district attorney having opened the case, produced a letter from the defendant, dated Philadelphia, July 7, 1798, and post marked on the same day, which was printed in Vermont on July 23. The authorship of the letter and the fact of publication were admitted by the defendant. It was further proved that the defendant had several times read at public meetings in Vermont the letter (known at the time as the "Barlow" letter) from which the libellous matter in the second count was taken. Several witnesses were called to show that the defendant, both in public and in private, had extensively used the letter for political purposes, and in doing so had frequently made use of language highly disrespectful to the administration. On cross examination it appeared that on one occasion he had endeavoured to prevent it from being printed.

The prosecution having closed its case, the defendant stated his defence to consist in three points: First, that the court had no jurisdiction of the offence, the act of congress being unconstitutional and void, if not so generally, at least, as to writings composed before its passage; second, that the publication was innocent; and third, that the contents were true.

On the first two points he offered no testimony, but on the third he proposed to call Judge PATERSON, the presiding judge, and Judge SMITH.

Judge PATERSON being then on the bench, was then asked by the defendant, whether he had not frequently "dined with the president, and observed his ridiculous pomp and parade?" Judge PATERSON replied that he had sometimes, though rarely, dined with the president, but that he had never seen any pomp or parade; he had seen, on the contrary, a great deal of plainness and simplicity.[3] The defendant then asked whether he (the judge) had not seen at the president's more pomp and servants there, than at the tavern at Rutland? To this no answer was given.[4] No other witness was called.

---

[3] The oddity of this proceeding—in which the fact of the defendant's asking a judge on the bench such a question as this. is only equalled by the judge setting to work to give a regular answer—can only be explained on the ground that the defendant, having no counsel, did not know any better, and that the court were unwilling to curtail him in his supposed defence. The answer, as reported in the Aurora. is the same as above. varying, however. the last line to "in place of pomp and parade, I have seen a good deal of hospitality, without much ceremony."

[4] The report in the Spectator continues: "And it was evident Mr. Lyon expected no more." That in the Aurora makes up for this by giving

Mr. Marsh, district attorney, addressed the jury at length, urging, (1) the libellous nature of the offensive passages, which were clearly within the act of congress, and (2) the declared intentions with which they had been used by the defendant, which expressly came up to the innuendoes.

Judge SMITH, (the then chief justice of Vermont,) who then appeared as counsel for the defendant, declining to reply, in consequence of the shortness of time allowed him for preparation, he having been called into the case at the bar, the defendant addressed the jury at great length, insisting on the unconstitutionality of the law, and the insufficiency of the evidence to show anything more than a legitimate opposition.

Before PATERSON, Circuit Justice, and HITCHCOCK, District Judge.

PATERSON, Circuit Justice (charging jury). "You have nothing whatever to do with the constitutionality or unconstitutionality of the sedition law. Congress has said that the author and publisher of seditious libels is to be punished; and until this law is declared null and void by a tribunal competent for the purpose, its validity cannot be disputed. Great would be the abuses were the constitutionality of every statute to be submitted to a jury, in each case where the statute is to be applied. The only question you are to determine is, that which the record submits to you. Did Mr. Lyon publish the writing given in the indictment? Did he do so seditiously? On the first point, the evidence is undisputed, and in fact, he himself concedes the fact of publication as to a large portion of libellous matter. As to the second point, you will have to consider whether language such as that here complained of could have been uttered with any other intent than that of making odious or contemptible the president and government, and bringing them both into disrepute. If you find such is the case, the offence is made out, and you must render a verdict· of guilty. Nor should the political rank of the defendant, his past services, or the dependent condition of his family, deter you from this duty. Such considerations are for the court alone in adjusting the penalty they will bestow. The fact of guilt is for you, for the court, the grade of punishment. As to yourselves, one point, in addition, in exercising the functions allotted to you, you must keep in' mind; and that is, that in order to render a verdict of guilty, you must be satisfied beyond all reasonable substantial doubt that the hypothesis of innocence is unsustainable. Keeping these instructions in your mind, you will proceed to deliberate on your verdict."

At about eight o'clock in the evening of the same day, after about an hour's absence, the jury returned with a verdict of guilty.[5]

The defendant being called up for sentence, a postponement was obtained till the next morning, when, after upon a representation of his circumstances, it appearing that he was almost insolvent, Judge PATERSON addressed him as follows: "Matthew Lyon, as a member of the federal legislature, you must be well acquainted with the mischiefs which flow from an unlicensed abuse of government, and of the motives which led to the passage of the act under which this indictment is framed. No one, also, can be better acquainted than yourself with the existence and nature of the act. Your position, so far from making the case one which might slip with a nominal fine through the hands of the court, would make impunity conspicuous should such a fine alone be imposed. What, however, has tended to mitigate the sentence which would otherwise have been imposed, is, what I am sorry to hear of, the reduced condition of your estate. The judgment of the court is, that you stand imprisoned four months, pay the costs of prosecution, and a fine of one thousand dollars, and stand committed until this sentence be complied with."

NOTE. The sedition laws, of which this trial was the first fruit, received the president's signature on July 14, 1798. The first section imposes a penalty on illegal combinations. The remaining sections are as follows:

"Sec. 2. And be it further enacted, that if any person shall write, print, utter, or publish, or shall cause or procure to be written, printed, uttered, or published, or shall knowingly and willingly assist or aid in writing, printing, uttering, or publishing any false, scandalous, and malicious writing or writings against the government of the United States, or either house of the congress of the United States, or· the president of the United States, with intent to defame the said government, or either house of the said congress, or the said president, or to bring them, or either of them, into contempt or disrepute; or to excite against them, or either or any of them, the hatred of the good people of the United States, or to stir up sedition within the United States, or to excite any unlawful combinations

---

[5] The report in the Spectator, says: "It is said that eleven of the jurymen were ready to find a verdict immediately on leaving the bar, but that one doubted. On which they read over the papers, and recapitulated the evidence, and the doubting juror said, it was impossible to acquit him. During the course of the trial, Mr. Lyon repeatedly observed that the jurors were packed, and brought from towns known to be inimical to him, for the purpose of crushing him; but the court, at its last May session, ordered the clerk to summon the jury from the towns, from which they actually came, so that it was impossible any reference could have been had to him. He also complained, that he was hurried to trial, and therefore was not prepared; but the public may rest assured that both on Saturday and Monday, the court several times told him the cause might be continued, that he might have ample time to prepare himself with evidence and counsel. There was a crowded auditory, and there has been no attempt to impeach the court, or jury of any impartial or improper conduct; on the contrary, there seemed to be a unanimous approbation of the court, the attorney and the jury."

---

a still stronger turn the other way. "The judge, conscious that there was some difference between the table at Braintree, and the humble fare of a country tavern, with the privileges of half a bed, made no reply, but smoked a cigar."

therein for opposing or resisting any law of the United States, of any act of the president of the United States, done in pursuance of any such law, or of the powers in him vested by the constitution of the United States, or to resist, oppose, or defeat any such law or act, or to aid, encourage, or abet any hostile designs of any foreign nation against the United States, their people or government, then such person being thereof convicted before any court of the United States having jurisdiction thereof, shall be punished by a fine not exceeding two thousand dollars, and by imprisonment not exceeding two years.

"Sec. 3. And be it further enacted and declared, that if any person shall be prosecuted under this act, for the writing or publishing any libel aforesaid, it shall be lawful for the defendant, upon the trial of the cause, to give in evidence in his defence the truth of the matter contained in the publication charged as a libel. And the jury who shall try the cause, shall have a right to determine the law and the fact, under the direction of the court, as in other cases.

"Sec. 4. And be it further enacted, that this act shall continue and be in force until the 3d day of March, one thousand eight hundred and one, and no longer: provided that the expiration of the act shall not prevent or defeat a prosecution and punishment of any offence against the law during the time it shall be in force." 1 Stat. 596.

The circumstances attending the passage of this act have been already noticed in the introduction to this work, and the legal and constitutional questions arising under it will be found fully discussed in the ensuing trials of Callender and Cooper.

Of the defendant in this case himself, who, for many years, was so famous in American politics, no biography, as far as I can find, has been written; and I have been obliged to depend upon the newspapers of the day, but more particularly upon the kindness of Henry Stevens, Esq., of Barnet, Vermont, for the collection of a few incidents in a life much more remarkable for the violence of its vicissitudes, and for the interest of its adventures, than for the intrinsic eminence of its subject. Matthew Lyon came over in 1755, or thereabouts, from Ireland, pennyless and friendless, and being then in his boyhood, was sold out to pay his passage, as the custom was, to Mr. Liversworth, at Cambridge, Massachusetts, the purchase-money being, as it was said, "a pair of three-year-old bull stags." To Vermont, where Mr. Liversworth lived, Lyon of course proceeded, and is said to have served out his time faithfully, making up by New England schooling, and by the free intercouse with the thin though bustling population in which he was now placed, for his early utter ignorance. Good-nature and enterprise, of which he was always possessed, and a sort of half-education, which by this time he had picked up, brought him, soon after he reached twenty-one, into contact with some of the leading men in the sparse and wild country which the border counties of Vermont then presented; and shortly before the battle of Saratoga, he became a subaltern officer in a corps of militia stationed on the frontier, in connection with the Northern division then under the command of General Gates. It was in this capacity that an incident occurred which once or twice threw its shadow on his future life. Whether it was the intense cold of the weather, or the excessive remoteness of the post, making direct supervision impracticable, or the nearness to their homes, for it was on the Onion river, and they were all Vermonters, it cannot now be said; but in the neighbourhood of Thanksgiving Day, or thereabouts, the men began to take their departure for their homes, and in a short time the officers followed them. Of course a return to the post when the sky was more genial did not atone for the prior desertion, and the result was that Lyon was cash-

iered by General Gates. A reversal of the sentence was made the next year, however, by General St. Clair, who succeeded to the command of the Northern department, and the delinquent corporal shortly afterwards was promoted by General Schuyler to the office of paymaster in Warner's regiment. This office he soon abandoned, in consequence of a squabble with a brother officer, and being now in the vigour of early manhood, with some little capital, and with much more enterprise, he returned to Vermont, where, in the village of Fair Haven, near Skeensborough, he started paper-making, type-casting, printing, publishing, ore digging, hollow-ware casting, and iron ware manufacturing generally. The general assembly of Vermont granted him power to raise by lottery "600 bushels of wheat," for such was the standard of value in those days, in order to enable him to enlarge his furnace, so as to cast "flat irons, spiders, bake-pans and dish-kettles," which in his petition he called the "solid coin in the state." In so primitive a state of society, where wheat was currency, and iron ware coin, the little village of Fair Haven soon became a large town, capable of looking down over its shoulder at the famous city of Vergennes, the only city in Vermont, which at the time contained hardly more private houses than it did public buildings, being "sixty" altogether; and so great was the plastic power of the new visitor, that the very creeks that were hurrying to empty themselves into the lap of Lake Champlain stopped on their way to lend a hand in turning the wheels of the huge saw-mill, "the like of which," it is said in a cotemporaneous paper, "never was seen before, as in the making of nail-rods and paper, as well as in the grinding of corn." Even the bark of the bass-wood tree, which formerly had been used only for the twisting of Indian baskets, was turned to a new purpose, and "The Scourge of Aristocracy and Repository of Important Political Truth," the political mouthpiece of Mr. Lyon, was printed on paper made by himself of material thus selected. With the class of politicians of whom Thomas Chittenden, then governor, Ethan Allen and Ira Allen were the representatives—the leaders of the "stern democracy," as it may really be called, of that manly though poor population—he soon became intimate, marrying about the time Governor Chittenden's daughter. Unfortunately, however, for his solvency as well as his reputation, not contenting himself with issuing, at very irregular periods, bass-wood sheets, covered with fierce denunciations of the peerage of the Cincinnati, or of the pageantry of the drawing-rooms, he ran for congress, and took his seat just in time to participate in the legislation of Mr. Adams's last two years. In Philadelphia his history had preceded him, nor were those who despised the lowness of his birth, and the humiliation of his early life, held back from turning him into a popular butt by any excess of exterior civilization on his part. To Cobbett's slashing pen an attraction like this was irresistible, and on Tuesday, June 6, 1797, hardly before Lyon was warm in his seat, he was thus saluted in Porcupine's Gazette: "The Lyon of Vermont.—To-morrow morning at eleven o'clock will be exposed to view the Lyon of Vermont. This singular animal is said to have been caught in the bog of Hibernia, and when a whelp, transported to America; curiosity induced a New Yorker to buy him, and moving into the country, afterwards exchanged him for a yoke of young bulls with a Vermontese. He was petted in the neighbourhood of Governor Chittenden, and soon became so domesticated, that a daughter of his excellency would stroke and play with him as a monkey. He differs considerably from the African lion, is more clamorous, and less magnanimous. His pelt resembles more the wolf or the tiger, and his gestures bear a remarkable affinity to the bear: this, however, may be ascribed to his having been in the habit of associating with that spe-

cies of wild beast on the mountains: he is carnivorous, but not very ferocious—has never been detected in having attacked a man, but report says he will beat women. He was brought to this city in a wagon, and has several days exposed himself to the public. It has been motioned to cage him, as he has discovered so much uneasiness at going with the crowd. Many gentlemen who have seen him do not hesitate to declare they think him a most extraordinary beast." 6 Porc. Works. 16. But Matthew Lyon was not the man to bear with this long. His natural good sense—and from the brief reports of his speeches he seems to have been well stored with this essential commodity—entitled him, he felt, to a more respectful treatment than this, and naturally enough he did not see why his early privations should be the subject of ridicule in a country which pretends to recognize all men as by birth equal. Several times he intimated this, but ineffectually, till at last Mr. Griswold ("Roger," of long gubernatorial memory). having one day, in front of the great hickory fire which was burning in the house of representatives, alluded in his presence to the "cashiering" under General Gates, a personal conflict ensued, which, repeated a few days after, was of so disgraceful a character as to lead to votes, wanting but little of a majority, for the expulsion. first of one and then of the other of the combatants. See "Report of Committee of Privileges," &c., 2d Feb. 1798—published by order of the house of representatives. See also 3 Jeff. Cor. 372.

It was in the recess between the two sessions that the trial in the text took place. It was undoubtedly a bold step on the part of the administration, for the alleged libels were written before the passage of the law, though published afterwards. The defendant was an active opposition member of the house of representatives, where the vote was so equally balanced as to make his withdrawal of national political consequence; and he was then a candidate for re-election. A conviction under these circumstances was calculated to inflame the country; nor was this feeling allayed by the publication throughout the land of the following letter from Lyon himself to General Mason, then a senator from Virginia:

"In jail at Vergennes (the only city in Vermont, it contains about sixty houses and seventy families). October 14, 1798.

"Dear General: I take the liberty to trouble you with a recital of what has happened to me within about ten days past. On Thursday, the 5th of this month, I was informed that a grand jury had been collected to attend the federal court at Rutland, about fifteen miles from my place of residence: that they were selected from the towns which were particularly distinguished by their enmity to me: that the jury was composed of men who had been accustomed to speak ill of me; that they had received a charge to look to the breaches of the sedition law; and that they had some publications of mine under consideration. The same night a friend called, and assured me that a bill was found against me, and urged me to be out of the way of being taken—he declared to me, that it was the wish of many of my friends. He informed me that the petit jury were taken from the same towns where the grand jury were; and that from every examination there were not more than two out of the fourteen which were summoned, who had not opposed me in the late election. He mentioned several zealous partisans for presidential infallibility among them, and one who had been lately writing the most virulent things against me, in his own name, which were published in a newspaper. My answer to all this was. it could not be honourable to run away—I felt conscious that I had done no wrong, and my enemies should never have it to say that I ran from them. An officer of the court had been in my neighbourhood the same evening to summon

witnesses; I had told him, if the court wanted me, he need bring no posse. he might come alone, I would go with him, there should be no resistance. Accordingly on Friday evening, the same officer, a deputy marshal, came with a warrant for my apprehension, which he gave me to read, and accepted of my word and honour as bail to meet him at Rutland court-house the next morning about nine o'clock. I was there accordingly; and soon after the court was opened I was called to the bar to hear the indictment read. It consisted of three counts; the first for having maliciously, &c., with intent, &c., written, at Philadelphia, a letter dated the 20th of June, and published the same at Windsor, in the newspaper called the Vermont Journal, containing the words following: (Here follow the passages set out in the text, pp. 333–4.) The third count was for aiding and abetting, &c., in publishing the same. I was called upon to know if I was ready to plead to the indictment. I answered, that I was always ready to say I was not guilty of the charges in the indictment, but that I was not provided with counsel, there being no person at Rutland I was willing to trust with my cause; I had sent to Bennington for two gentlemen on whom I could rely, Messrs. Fay and Robinson, who would be here by Monday. It was then signified to me, that I might have the trial postponed until the session of the court in May next. This I could not wish for, as that session was to be at Windsor. over the mountain, where they were sure of having a unanimous jury, such as they wanted. In the fourteen jurymen before me, I thought I saw one or two persons who knew me, and would never consent to say that I was guilty of an intention of stirring up sedition; I was unwilling to remain under a censure of the kind; for these reasons I chose to come to trial; I accordingly gave bonds for my appearance the next Monday. Saturday and Sunday were violent stormy days, and at the opening of the court on Monday, I had heard nothing of my counsel, nor my messenger; I so informed the court, and told them I thought we should hear from them in an hour, for which time the court adjourned. Within that time my messenger returned, with news that Mr. Fay's wife was very sick, and Mr. Robinson, who is a member of the legislature, was preparing to attend, and could not be at Rutland so soon as that time. Mr. Smith, who is our chief justice, was present, although he and I had been formerly competitors for the representation of this district in congress; he is a Republican, and many of my friends are now his friends; they applied to him to assist me, and I understood he had consented. Thus circumstanced, I proceeded to trial. So ignorant was I of law proceedings, that I expected to object off the inveterate part of the jury, without giving particular reasons. or supporting them by evidence: I was, therefore, unprepared. The attorney for the United States was called on to say if he had any objections to the jury. He said he had to a Mr. Board; he believed he had given an opinion in the cause; to prove which, he called upon a deputy sheriff, who swore he had some conversation on the Saturday before, with Mr. Board, in which he understood Mr. Board to speak as if he thought that Mr. Lyon would not be condemned, or some such thing; Judge Paterson inquired if there was not enough for the panel without him, Mr. Board. He was answered, there were thirteen more. Mr. Board was ordered off. Thus was the only man swore away, that knew me enough to judge of my intentions. No one doubts that the deputy sheriff began a discourse with Mr. Board on purpose to have something to swear. Mr. Board said, he expected that was the case when he came to him, and he carefully avoided conversing with him. I objected to two of the jury on account of their violent opposition to me; and although unprepared with regard to truth, I called on some

persons present to see if they could recollect any virulence made use of by those two; and I sent for the newspaper to prove the abuse of the one who had published; the judge observed, that a difference in political opinion could be reason against a juryman, and as there were twelve beside, he ordered the person who had been libelling me, off. Here I plead to the jurisdiction of the court, on account of the unconstitutionality of the law. My plea was overruled, but I was told I might make use of the arguments in any other stage of the trial.

"The attorney, on the part of the United States on the first count, produced my original letter, on which was the Philadelphia postmark, July 7. He attempted to bring some evidence to show that the letter did not arrive at Windsor until after the 14th of July; the printer's boy thought it did not arrive until the 20th, and Mr. Buck saw the setting from it about the 23d, or later; I acknowledged the letter. As to the second count several evidences were brought to swear they heard me read the letter, said to be the letter from a diplomatic character in France, from a manuscript copy, supposed to be in my own handwriting; they were inquired of whether the reading of the letter caused any tumult? One of the evidences, a young lawyer, and another person an associate of his, said that they thought it did at Middletown. One of them said he heard a person say, there must be a revolution, and they both agreed that there was a noise—and some tumult after the reading of that letter and some other papers. On my inquiring of them the cause of the tumult, and there opinion, if there would have been any tumult there, if they had not followed me on purpose to make a disturbance? they acknowledged, they thought if they had not been there, there would have been no disturbance; and they also agreed, that the tumult was caused by the other people's disliking their being there and their conduct then; they agreed also that I refused to give an opinion upon the letter. In proof of the third count, the attorney produced evidence to show that the printed pamphlet, entitled a copy of a letter from a diplomatic character in France, was taken from a manuscript in my hand, and the printer said he received the copy from my wife. The evidence all agreed that I had ever been opposed to the printing of the letter and gave for reason, that I had promised the gentleman to whom the original had been written, that I would not suffer it to be printed. The young lawyer said that I told him, there were not above one or two passages in the letter which could be called seditious. The attorney proceeded to sum up the evidence and dwelt on everything which he thought proper to point out the appearance of evil intentions. As soon as he had seated himself, or before Judge Paterson rose and was proceeding to give his charge to the jury, I interrupted him with an inquiry into the cause why I should not be heard; he politely sat down and directed me to proceed. My defence consisted of an appeal to the jury, on the unconstitutionality of the law, the innocence of the passage in my letter, and the innocence of the manner in which I read the letter. It was said I spoke two hours and upwards. Mr. Smith declined speaking, as he was unprepared. The attorney replied as decently as any man of his profession and principles would. The charge from the judge was studiedly and pointedly severe. After telling the jury, if they leaned any way, it ought to be in favour of the defendant, he proceeded to dwell on the intention and wickedness of it, in the most elaborate manner; he descended to insinuate that the Barlow letter, as it was called, was a forgery; he said, let men of letters read that letter and compare it with Barlow's writings, and they would pronounce it none of his. He told the jury that my defence was merely an appeal to their feelings, calculated to excite their pity; but mercy,

he said, did not belong to them, that was lodged in another place; they were to follow the law, which he explained in his own way, and supported the constitutionality of it. The jury retired about eight o'clock in the evening, and in about an hour they returned with a verdict, Guilty! The judge observed to me, that I had then an opportunity to show cause why judgment should not be pronounced against me, and to show what was my ability or inability to pay a fine, as a man of large property, in such a case, ought to be obliged to pay a greater fine than one of smaller property. I replied, I did not expect anything that I should say would have any influence on the court, in the present stage of the business. The judge said I might think of it until morning, and the court adjourned until nine o'clock next morning; I then attended, and after being called upon, I observed to the court in reply to what had been said to me upon the score of property, that a few days ago I owned a property, which I estimated, some years since, at twenty thousand dollars; in the present state of the affairs of our country, I did not expect it would fetch half that sum.. I had lately made over all the productive part of it, to secure some persons who were bound to me for debts, to the amount of sixteen or seventeen hundred dollars; there still remained enough to be worth much more than the court were impowered to fix the fine at; but in the present scarcity of cash, and the prospect of lands soon to be sold very cheap, I did not know that I could possibly raise two hundred dollars in cash upon it.

"The judge, after an exordium on the nature of the offence, the malignity of it in me, particularly being a member of congress, and the lenity of the sedition bill, which did not allow the judges to carry the punishment so far as common law did, pronounced sentence that I be imprisoned four calendar months, pay a fine of one thousand dollars, and stand committed until the judgment should be complied with. This sentence was unexpected to all my friends as well as myself; no one expected imprisonment. The marshal is a man who acted as clerk to some persons whom I had occasion to transact some business with about a dozen years since, when he first came into this country, in which he behaved so that I have ever since most heartily despised him; this he has no doubt seen and felt. The moment sentence was pronounced, he called me to him, and ordered me to sit down on a certain seat in the courthouse; he called two persons to give me in charge to, one of them the person who followed me to Middletown to insult me, and was on the trial improved as an evidence. I asked if they would go with me to my lodgings a few minutes, so that I might take care of my papers? I was answered in a surly manner, No; and commanded to sit down. I stood up. After the court adjourned, I inquired what was to be done with me until my commitment. I expected I should be confined in the prison in Rutland, the county where I lived; I was told that the marshal was authorized to imprison me in what jail in the state he pleased, and that I must go to Vergennes, about forty-four miles north of Rutland, and about the same distance from my seat at Fair Haven. I inquired what were the accommodations there? and was answered in a manner peculiar to the marshal himself, that they were very good. I told the marshal, since it had become my duty to go there, he needed no assistance, I would go with him. He said he would not trust to that, and prepared two troopers, with their pistols to guard me. He ordered me to ride just before them; in this manner I left Rutland. After riding a few miles he overtook us and rode by us; he rode pretty fast and whispered to one of the young men: I learned his intention was, to get to Middlebury, the shire town of Addison county, in order to throw me into a

dirty dungeon-like room for that night. I did not mend my pace; he came back and scolded; insulted and threatened; he repeated it. His friends, I was told, expostulated with him, and the humane young men, who were employed as guards, told him they would rather watch me all night, than that I should be thrown into the jail; we lived at a tavern about four miles short of Middlebury jail; the young men watched: the next day we arrived at this place; there are two roads to come into it. one comes up straight to the jail-house, by but two or three houses; the other is circuitous, taking almost the whole length of the little city in its course. I was foremost and inclined to take the nearest road, but the gentleman, by that route, would lose a share of his triumph; he ordered us in a peremptory tone into the circuitous road through the city. On the way from Rutland, he undertook to direct me, and stop me as to speaking, and told me I should not have the use of pen, ink and paper. On Wednesday evening last I was locked up in this room, where I now am; it is about sixteen feet long by twelve wide, with a necessary in one corner, which affords a stench about equal to the Philadelphia docks in the month of August. This cell is the common receptacle for horse-thieves, money-makers, runaway-negroes, or any kind of felons. There is a half-moon hole through the door, sufficient to receive a plate through, and for my friends to look through and speak to me. There is a window place on the opposite side, about twenty inches by sixteen, crossed by nine square iron bars; all the light I have is through this aperture; no fireplace in the cell, nor is there anything but the iron bars to keep the cold out; consequently I have to walk smartly with my great coat on, to keep comfortably warm some mornings.

"On Thursday morning last, I asked a friend for his pen and ink, in presence of the jailer. It was offered me; but the jailer said, it was against his orders, I must not have it. The marshal paid me a visit on Thursday evening, he examined the cell, looked on my little table to see what was there: but he found nothing but Volney's Ruins, the late laws, some of the president's messages, and a list of the petit jury. I inquired of him before, or then, what situation I was to consider myself in with regard to the use of pen and ink? His answer was, I might use them, but he must see everything I sent out of the jail; if I concluded otherwise, (looking at a chain that lay on the floor,) he said he would put me in a situation that I could not write. I asked him what he meant by that? He told me I was at his disposal, and if I did not behave like a prisoner, he would send me to Woodstock jail. I told him there would be no advantage in that, he would not be there always, and I should get rid of the sight of him. On Friday, for the first time, two brothers-in-law were admitted to come in to see me. Some of my friends expostulated with the marshal on the subject of denying me pen and ink; and in the evening I observed a man hammering on the prison door. You seem much concerned about that door (said I); there has scarce been an hour since I came here, but there has been some person hammering at the door, or putting on new bolts or bars. It is all useless, said I: if I wished to come out, they could not hold me; and as I do not, if my limits were marked by a simple thread, I would not overstep it. He replied, he was only nailing up an advertisement. Next morning, when the house was very still, I heard some person step up and read the advertisement on the door; it contained a preamble concerning my having complained that I was debarred the use of pen and ink and paper, and a declaration that I had leave to furnish myself with those things, and use them as I thought proper, signed by the marshal. As soon as I could get my eye on a person that would go and fetch General Clark, my friend

and brother-in-law, who is a member of the legislature now sitting here, I sent one. He came. I desired him to read the advertisement, and tell me what I should do concerning the treatment of Fitch, the marshal. He said he would go and see Fitch, and see how he explained the business—he went to Fitch's house, but could not find him; some other business occupied him the rest of the day. I next morning sent for a number of friends, who got admittance, and after some conversation on the subject before the jailer, and getting his explanation of the advertisement, that he considered me now allowed to write, without submitting my productions to the marshal. I was solemnly invested with pen and ink. The first use I have made of it, after a line to my wife, is to write you this long, prolix account of the fruits of this beloved sedition bill. You may remember that I told you, when it was passing, that it was doubtless intended for the members of congress, and very likely would be brought to bear on me the very first; so it has happened, and perhaps I, who have been a football for dame fortune all my life, am best able to bear it. I have long disobeyed your injunction to write to you, waiting to be able to give you an account of the elections.

"The noise that has been made about the public and private negotiations of our envoys at Paris, has answered the purposes of the aristocrats completely, (on the other side of the mountain. I mean, Morris's district,) to exasperate the unthinking people against every Republican. Governor Robinson had more than half of the votes on this side of the mountain; but Tichenor has got a great majority; in the whole he had 6,211; Robinson, 2,805, beside, I am told, there were about five hundred for him, which were lost by inaccurate returns; there were also 332 scattering votes.

"Monday, October 15.

"I have just learned that Morris is re-elected, and I have received the list of the votes for representatives to congress in this district; they stand for your friend

Lyon,           3,482
Williams,       1,554, an aristocratic candidate.
Chipman,        1,370,      do      'brother to your little horsenail maker.
Spencer,        285. and several other aristocrats.
Israel Smith,   274. and several other Republicans.
                 80 given in for governor, and the representatives of the several towns in assembly, by one accident or another, put into the box for representatives to congress.
                ─────
                6,985
                3,482
                ─────
                3 503"

Lyon's imprisonment was enforced with a rigour which excited the great mass of his constituents to such a pitch as to lead to a popular rising, the avowed object of which was, to tear down the prison. This, however, he succeeded in suppressing, and in fact his whole demeanour was marked with great prudence and tact. His wife, with her sisters, the daughters, as has been noticed, of Governor Chittenden, having one day visited him, the usual barrier to their entrance was removed, and she was permitted to enter the cell. At this moment some less prudent friend intimated that now was the period to escape. "That he shall not do," said the prisoner's wife, "if I stand sentinel myself." The spirit, energy, and devotion shown by this eminent lady during her husband's imprisonment, gave fresh vigour to his supporters, and courage to himself. In fact, so awkward did his position become to the administration, that the cabinet panted for an excuse to liberate him. His determination to give up nothing on the one hand, coupled with his constant and watchful exhortations to his supporters to yield the most implicit obedience to the law, made the difficulty peculiarly embarrassing. Had he apolo-

gised on the one hand, or stormed on the other; had he either petitioned for a pardon, or connived at a rescue: he could easily have been disposed of. But neither of these would he do. An attempt to induce him to take the former step, backed, it was intimated, by a high promise, failed.' An attempt to involve him in the latter, he himself frustrated. In the mean time another vote was taken for congress in his district—an election having failed on the first trial from want of a choice—and the result was that Mr. Lyon received 4576 votes, to 2444 for Mr. Williams, the Federal candidate, and was returned by a majority of about 600 over all. On February 8th, 1799, in a letter dated at Vergennes jail, he returned his thanks to his constituents for their vote, and proceeded with a degree of ardour which his long imprisonment might easily explain, to animadvert upon the existing administration. (See Aurora, Feb. 8th, 1799.) The feeling thus created, was aggravated by Mr. Adams' reply to the parties who came on to Philadelphia to represent to the president the loss their interests suffered from the detention during the session of their representative in prison.—"repentance must precede mercy." The powerful revolutionary interest with which Lyon in early life had been connected rallied to his support, and though for Mr. Adams, the electoral vote, after considerable struggle, was secured, Vermont immediately afterwards finally left the Federal party.

On Mr. Lyon's return to Philadelphia, he was met by the following resolution: "Resolved, that Matthew Lyon, a member of this house, having been convicted of being a notorious and seditious person, and of a depraved mind, and wicked, and diabolical disposition, and of wickedly, deceitfully, and maliciously contriving to defame the government of the United States, and of having, with intent and design to defame the government of the United States, and John Adams, the president of the United States, and to bring the said government into contempt and disgrace, and with intent and design to excite against the said government and president, the hatred of the good people of the United States, wickedly, knowingly and maliciously written, and published certain scandalous and seditious writings or libels, be, therefore, expelled from this house." This was opposed by Mr. Gallatin and Mr. Nicholas, and upon being put to the vote, there appeared 49 for it, and 45 against it, and was of course lost, two-thirds of the members present not concurring in the vote. Cobbett, of course, did not let this opportunity of having a slap at his old antagonist pass unused. In Feb., 1799 (10 Porc. 107), he says: "Lyon looks remarkably well for a gentleman just out of jail. This man's re-election, while confined as a criminal, is a new and striking proof of the excellence of the system of universal suffrage, and must convince every one except a perverse royalist, that the American government is, as Mr. Lang says, 'the only lawful government on earth,' happy must the nation be where it is but a single step from the dungeon to the legislature! Well might the pathetic Mr. Murray, (speaking on the old alien law,) express his fears, that the influx of foreigners would 'contaminate the purity and simplicity of the American character.'" In 1801, Mr. Lyon, at the close of the sixth congress, being the last in Mr. Adams' administration, declined a re-election, and left Vermont for Kentucky, where neither his business nor his political activity abated. In 1803, one session having run by in the mean time, he made his appearance in Washington, which had then become the seat of government, as a Kentucky representative. House Journal, 7, and 8 Cong. 402. The tables were now turned, as what in his last legislative campaign had been a minority, powerful, it is true, but the subject of banter and sometimes of something harsher still, had now become a majority so

preponderating as almost to bear down dissent by the mere force of numbers. From having been the butt of the house, Mr. Lyon found himself now one of its heroes. The intolerant disposition with which majorities view the idiosyncrasies of their opponents, which first had worked against him, had now shifted to the other side; and perhaps if he had been disposed to turn the tables, he might have made the lank visages of the Connecticut members as much a subject of amusement as in former times they had made his own bearishness of look and manner. But to do him justice, this "wild Irishism," which had not been rubbed off in the mountains of Vermont, had at last been reduced in the forests of Kentucky. He is said by those who recollect him at this stage to have been a man of respectable bearing, and of frank and almost engaging manner; making up by his openness of temper and force of mind for his great defects of education and training. He continued to sit as a member from Kentucky through the eighth, ninth, tenth, and eleventh congresses, retiring in 1811, having previously refused the commissaryship of the Western army tendered to him by Mr. Jefferson.

After his withdrawal from congress, Mr. Lyon (or Col. Lyon, as he appears by this time to have been called) returned to Kentucky, where a short time afterwards he received from Mr. Monroe the appointment of United States factor for the Cherokee Nation. This drew him west of the Mississippi, and though by this time an old man, he displayed in the uncleared plains of the then outskirts of the Union the same surprising activity that he had shown in the once border lands of Vermont and Kentucky. Not content with sending to the press from time to time epistles which for good sense and political sagacity take rank decidedly above the average, and which exhibit a style which, though retaining its point, had by this time lost its roughness, he kept himself still in the ranks of that outpost of pioneers which is always a little ahead of civilization. Just before his death, when in his seventy-seventh year, he performed a journey which was recorded at the time by the hardy people who saw it, as a wonder in its way, and the history of which deserves now to be rescued from the newspapers where it long has lain dormant. See Niles' Reg. June 29, 1829, p. 287. His home was then at Spadre Bluff, a "town," as it was called, on the Arkansas river, about one hundred and forty miles above Arkansas City. About the first of the year 1822, he set to work to load a flat boat, which he himself had built, with furs, peltries, and Indian commodities, which he safely launched in the Arkansas river, and as safely piloted to New Orleans. Soon furs, peltries and Indian commodities were exchanged both for iron ware, almost equal in variety to the products of his old forge at Fair Haven, and for everything else that was necessary for the factory at Spadre Bluff, among which was included the machinery for a gigantic cotton gin, weighing fourteen hundred pounds. The outward passage was begun on the first of February in a climate and in a season eminently severe; but it did not chill the fires of the old pioneer, for on his way back, not content with pursuing the straight road home, he stopped at the mouth of White river, stored his freight there, and paid a flying visit to his Kentucky friends, having gone through within three months a journey of over three thousand miles, and this under weather and current so adverse that many a time he was obliged to spend hours in wading through the shallow stream, guiding his hands while they attempted to drag along the grounded flat boat, and always insisting upon doing his part in "rowing, steering, or cordelling." But this was the last time he was to drop down the current of the Mississippi, or visit, by way of an interlude, his second home

in Kentucky, for robust as he was, the chill of old age was at hand, and like the night of northern climates, was destined to drop upon him without the notice of an intermediate twilight. On August 1st, 1822, at Spadre Bluff, in his seventy-seventh year, died Matthew Lyon, loved as a neighbour, for he was full of that chivalrous spirit of generosity which is not a strange inmate of an Irish heart; and valued as a friend, for upon that warm temperament had been grafted the fertility of expedients belonging to the American pioneer.

The repayment to Mr. Lyon of the fine imposed in the trial in the text, was during his life brought before several successive congresses, but though it obtained at different periods the approval of the individual branches, for a long time, through the negligence encountered by private bills at the end of a session. it did not secure their concurrent sanction. At last, on July 4th, 1840, a bill to pay the sum with interest to Mr. Lyon's legal representatives, having passed through both houses, received the president's signature, having been preceded by a report of a committee in which the principles upon which the trial was conducted were emphatically repudiated, and a series of prior reports referred to, in which the same positions were taken. See 1st Sess. 26th Cong., Doc. 86, House Rep. Thus just forty years after the passage of the sedition law was its last vestige effaced, and its doctrines finally disowned.